179 P.3d 1239 (2008)
2008-NMCA-032
STATE of New Mexico, Plaintiff-Appellant,
v.
Charles SOTO, Defendant-Appellee.
No. 26,861.
Court of Appeals of New Mexico.
January 8, 2008.
Certiorari Granted February 28, 2008.
*1240 Gary K. King, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Appellant.
Gary C. Mitchell, P.C., Timothy L. Rose, Ruidoso, NM, for Appellee.
Certiorari Granted, No. 30,894, February 28, 2008.

OPINION
FRY, Judge.
{1} The State appeals the district court's order suppressing methamphetamine discarded by Defendant after he was stopped by police. Two police officers in a patrol vehicle observed Defendant riding his bicycle on a road near a racetrack's secured area around 2:30 a.m., and the officers decided to "see where he was headed." When the patrol vehicle pulled up next to Defendant's bicycle, Defendant stopped, something dropped out of his hand, and he placed his foot on it. The officers introduced themselves and asked Defendant several questions about where he was going and where he lived and then asked for Defendant's identification. Defendant produced his driver's license, whereupon the officers ran a warrant check and discovered that there was a felony warrant for Defendant. The officers placed Defendant under arrest and seized the object Defendant had discarded, which tested positive for methamphetamine. We conclude that Defendant was seized without reasonable individualized suspicion in violation of the Fourth Amendment to the United States Constitution. We affirm the district court's suppression of the methamphetamine.
BACKGROUND
{2} The only witness who testified at the suppression hearing was Andrew Friberg, an officer with the Ruidoso Downs Police Department. He testified that on July 7, 2005, he and Officer Bob Regan were parked doing stationary traffic patrol at about 2:30 a.m. when they observed Defendant riding a bicycle on the service road that goes down to the racetrack. While the road is a public one, it runs next to a secured area of the racetrack. The officers decided they would do a "field interview," which involves asking a subject for identification and recording the subject's name, date of birth, social security number, telephone number, and address for future reference. Officer Friberg testified that this is a way of building rapport with the community. He said that it is the practice of the Ruidoso Downs Police Department to routinely pull people over in order to get information about their identities. That way, if something happens later, the police can go back and review who was out and about.
{3} The two officers pulled up in their vehicle alongside Defendant. They did not turn on their lights or attempt an "enforcement stop." As they pulled up next to Defendant, he stopped his bicycle, dropped something out of his right hand, and stepped on the object with his foot. The officers introduced themselves and asked Defendant *1241 where he was headed. Defendant said he was going to his house, and Officer Friberg asked Defendant where his house was. Defendant said it was on Highlands. Friberg asked Defendant for the address, whereupon Defendant said he could not give an address or that he did not know. Friberg then asked Defendant for identification and Defendant produced a driver's license. The officers ran a warrant check, which was routine procedure after obtaining identification. This check revealed that there was an outstanding felony warrant for Defendant. The officers arrested Defendant and placed him in the patrol car. The object that Defendant had dropped was a jeweler's bag containing a crystalline substance, which Officer Friberg believed was methamphetamine. This belief was confirmed by a field test on the substance.
{4} Defendant was charged with possession of a controlled substance. Defendant filed a motion to suppress the methamphetamine on the ground that the officers seized him unlawfully. Following a hearing on the motion, the district court entered findings of fact and conclusions of law and granted the motion. This appeal followed.
DISCUSSION
{5} The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The State argues that the district court erred in suppressing the evidence because mere police questioning is not a seizure that is subject to constitutional protection. The State contends that Defendant stopped his bicycle voluntarily and that the ensuing conversation between the officers and Defendant was consensual.
{6} In determining whether an encounter between a citizen and police is consensual or constitutes a seizure, we consider "whether, under the totality of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." State v. Williams, 2006-NMCA-062, ¶ 10, 139 N.M. 578, 136 P.3d 579 (internal quotation marks and citation omitted), cert. denied, 2006-NMCERT-006, 140 N.M. 224, 141 P.3d 1278. We presume the citizen to be an innocent reasonable person and we "consider the sequence of the officer's actions and how a reasonable person would perceive those actions." Id. (internal quotation marks and citation omitted). The circumstances surrounding the encounter, including the question of whether the officers used a show of authority, constitute a factual inquiry reviewed for substantial evidence. State v. Jason L., 2000-NMSC-018, ¶ 19, 129 N.M. 119, 2 P.3d 856. The question of whether the circumstances would have caused a reasonable person to believe he or she was not free to decline the officers' requests is a legal inquiry, which we review de novo. Id.
The Encounter Constituted a Seizure of Defendant
{7} The crux of this case revolves around the legal question of whether a reasonable person in Defendant's situation would have felt free to leave. In assessing this question, "we look to three factors: (1) the police conduct, (2) the person of the individual citizen, and (3) the physical surroundings existing at the time of the encounter." Williams, 2006-NMCA-062, ¶ 13, 139 N.M. 578, 136 P.3d 579. Here, Defendant was riding a bicycle at 2:30 a.m. on a public road when the officers pulled their patrol car next to him and began to question him.
{8} Regarding the circumstances surrounding the encounter, the district court found that "[w]hile the officers did not engage their `lights', they `pulled up next to' the Defendant in their patrol car, at which time the Defendant stopped his bicycle. The officers immediately began to question him and requested his driver's license." The evidence supports these findings, which establish that the officers used a show of authority in their initial contact with Defendant.
{9} The State argues that the officers did not engage their lights or otherwise force Defendant to stop and that the officers did not approach Defendant in an authoritative manner. Consequently, the State maintains that a reasonable person in these circumstances "would have believed that he could *1242 have proceeded on his way riding his bicycle."
{10} The State contends that this case is similar to State v. Walters, 1997-NMCA-013, 123 N.M. 88, 934 P.2d 282. In Walters, this Court held that the defendant was not seized when a police officer followed the defendant's vehicle at night on an unlit rural road, stopped behind the defendant's vehicle when it stopped, and engaged the patrol car's emergency lights. Id. ¶¶ 2-5, 16. According to the State, the circumstances in this case are similar and, consequently, we must reach the same conclusion that there was no seizure of Defendant. We do not agree that this case is similar to Walters.
{11} In Walters, the defendant did not even realize that he was being followed by a police officer. Id. ¶¶ 4, 15. He thought that the vehicle behind him "wanted the road and might be impaired, and therefore he pulled over quickly and came to a stop on the side of the road." Id. ¶ 5 (internal quotation marks omitted). Consequently, there was no show of authority that caused the defendant to stop. Id. ¶ 15.
{12} By contrast, in the present case the patrol car pulled up next to Defendant, who was utilizing a much smaller mode of transportation, a bicycle. Officer Friberg testified that "[w]e pulled up next to him and he stopped his bicycle then." Thus, a reasonable inference is that it was the presence of the patrol car that caused Defendant to stop. In addition, as soon as Defendant stopped his bicycle, the officers began to question him about where he was going and they ultimately asked Defendant to produce identification. They then retained Defendant's identification in order to run a warrant check. In our view, a reasonable person in Defendant's situation would have felt compelled to stop and would not have felt free to leave.
{13} We explained in State v. Scott that "[f]or a contact requested by the police to remain consensual, the police are not permitted to convey a message that compliance with their requests is required." 2006-NMCA-003, ¶ 18, 138 N.M. 751, 126 P.3d 567 (internal quotation marks omitted). "[A] seizure occurs when there is either a use of physical force by an officer or submission by the individual to an officer's assertion of authority." Id. ¶ 19 (internal quotation marks and citation omitted). In the present case, the patrol car containing two officers pulled up next to Defendant's bicycle, and Defendant submitted to this show of authority by stopping his bicycle. In addition to the assertion of authority evidenced by the patrol car pulling up next to Defendant, the officers then began questioning Defendant about his activities, asked Defendant for identification, and retained Defendant's driver's license in order to run a warrant check, all of which, in combination with the lateness of the hour and Defendant's isolation on the road, conveyed to Defendant that the officers expected Defendant to comply with their requests. See State v. Affsprung, 2004-NMCA-038, ¶ 15, 135 N.M. 306, 87 P.3d 1088 (holding that the passenger in the car lawfully stopped for a traffic violation would not feel free to leave or to refuse officer's request for identification); see also People v. Mitchell, 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d 642, 647 (2005) (concluding that a reasonable person would not have felt free to leave when police were holding his identification in order to run a warrant check). A reasonable person under the circumstances would not "feel free to disregard the officer[s] or terminate the encounter." Scott, 2006-NMCA-003, ¶ 17, 138 N.M. 751, 126 P.3d 567.
{14} The recent case of City of Roswell v. Hudson bolsters our conclusion. In that case, a citizen called a police officer's cell phone and asked her to check on a vehicle, which did not belong to anyone in the citizen's neighborhood and which had been parked in the neighborhood for thirty minutes. 2007-NMCA-034, ¶ 2, 141 N.M. 261, 154 P.3d 76. The officer called another officer, who was already in the area, and asked him to investigate. Id. ¶ 3. Like Officer Friberg in the present case, the responding officer decided to complete a "field investigation card." Id. The officer in Hudson saw a vehicle occupied by the driver and the defendant legally parked on the street; neither occupant was engaged in suspicious activity. Id. ¶ 13. The officer parked behind the car, shined his spotlight on the car, and then approached the car and began questioning the occupants about what they were doing. *1243 Id. ¶¶ 4-5. The driver said that he lived in the house the car was parked in front of, but the address on his driver's license did not match the house's address. Id. ¶ 5. The driver then stated that the defendant lived in the house, and the officer asked the defendant for his identification. Id. We held that these circumstances constituted a detention of the defendant because a reasonable person in the same situation would not feel free to leave. Id. ¶ 14.
{15} Like the defendant in Hudson, Defendant was not doing anything that the officer in question articulated as causing suspicion of criminal activity. And in both cases, the approaching officers undertook a show of police authority. In Hudson, the show of authority consisted of the police car stopping behind the car in which the defendant was a passenger and shining its spotlight at the car late at night. Id. ¶ 13. Here, the show of authority was the police car pulling up beside Defendant's bicycle and the police officers questioning Defendant at 2:30 a.m. We conclude that these circumstances, plus the demand for Defendant's identification, and the holding of Defendant's driver's license for the warrant check together constituted a seizure, just as the encounter with and demand for identification from the defendant in Hudson, see id. ¶¶ 13-14, constituted a seizure, because a reasonable person in Defendant's position would not feel free to simply ignore the officers and ride off on his bicycle.
{16} The State relies extensively on three United States Supreme Court cases, which it claims stand for the proposition that a police officer may question a person and request identification without implicating the Fourth Amendment. See Muehler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); Hiibel v. Sixth Jud. Dist. Ct. of Nevada, 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004); United States v. Drayton, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Both Muehler and Drayton relied on Florida v. Bostick, which made it clear that a police officer may question a citizen and request identification "[s]o long as a reasonable person would feel free to disregard the police and go about his business." 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (emphasis added) (internal quotation marks and citation omitted); see Muehler, 544 U.S. at 101, 125 S.Ct. 1465 (citing Bostick); Drayton, 536 U.S. at 201, 122 S.Ct. 2105 (same). In this case, the surrounding circumstances reflected more coercion than mere questioning and a request for identification.
{17} The State's reliance on Hiibel suffers from the same flaw. 542 U.S. at 185, 124 S.Ct. 2451 ("[I]terrogation . . . or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. . . . [T]he Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." (first alteration in original) (emphasis added) (internal quotation marks and citations omitted)). In the Fourth Amendment context, "[t]he proper inquiry [to determine whether an encounter was consensual] necessitates a consideration of all the circumstances surrounding the encounter." Drayton, 536 U.S. at 201, 122 S.Ct. 2105 (internal quotation marks and citation omitted). Consistent with this case law, we hold that there was a sufficient show of authority to constitute a seizure based on all of the circumstances in the present case. With that show of authority, a reasonable person would not have felt free to decline to answer the officers' questions and request for identification, nor would a reasonable person have felt free to ride away while the officers held the person's driver's license to check for outstanding warrants.
The Seizure Was Not Justified by Individualized Reasonable Suspicion
{18} Having determined that Defendant was seized, we must now consider whether the seizure was justified by reasonable suspicion of criminal activity. See State v. Patterson, 2006-NMCA-037, ¶ 15, 139 N.M. 322, 131 P.3d 1286 (explaining that "investigatory detentions [must] be supported by reasonable suspicion of criminal activity"). "To justify detention, suspicion must be particular to the individual being detained." Id. ¶ 16.
{19} The State appears to rely almost exclusively on its argument that Defendant *1244 was not detained and that, consequently, reasonable suspicion was not necessary to justify the encounter. Because we disagree with the State on its underlying premise, we must address the question of whether there was reasonable suspicion, and we conclude that there was not.
{20} Officer Friberg did not testify to any basis for believing "that the law [was] being or ha[d] been broken." Jason L., 2000-NMSC-018, ¶ 20, 129 N.M. 119, 2 P.3d 856 (internal quotation marks and citation omitted). He testified that he and Officer Regan decided to approach and question Defendant only because he was riding his bicycle near a secured area and because they wanted to "see where he was headed." Officer Friberg also said that he and Officer Regan "figured we'd just do a field interview. That way we let him go on his way and . . . if anything happened that night we knew who was in the area." These reasons do not constitute a legitimate reason for detaining Defendant. Id. ("Unsupported intuition and inarticulate hunches are not sufficient." (internal quotation marks and citation omitted)).
Discovery of the Outstanding Warrant Did Not Justify the Seizure
{21} The State, relying in part on State v. Jones, 270 Kan. 526, 17 P.3d 359 (2001), argues that Defendant's felony warrant, discovered after Defendant produced his driver's license, justified the initial detention because it provided probable cause for Defendant's arrest. It does not appear that the State made this argument below. See In Re Aaron L., 2000-NMCA-024, ¶ 10, 128 N.M. 641, 996 P.2d 431 (explaining that reviewing court will not consider issues not raised in the trial court). However, even if the State preserved this issue, we are not persuaded.
{22} In Jones, a police officer stopped a vehicle for speeding and, consistent with established routine, asked the defendant-passenger as well as the driver for identification. 17 P.3d at 527. A records check revealed that there was an outstanding warrant for the defendant. Id. The ensuing search of the defendant's clothing yielded drugs. Id. The trial court denied the defendant's motion to suppress the evidence, and the Kansas Court of Appeals and Supreme Court affirmed. Id.
{23} The Kansas Supreme Court held that, regardless of whether the defendant had been unlawfully detained, the officer had the right to arrest the defendant once the warrant surfaced. Id. It stated that "the discovery of an outstanding arrest warrant constitutes an intervening circumstance which dissipates the taint of an initial impermissible encounter." Id. at 528 (internal quotation marks and citation omitted). The State contends that, as in Jones, the discovery of the warrant for Defendant in the present case allowed the officers to arrest Defendant, even if the initial detention of Defendant was illegal, and the officers had the right to search the area around Defendant incident to that arrest.
{24} We find the reasoning in Mitchell to be more persuasive than Jones. In Mitchell, police officers encountered the defendant on foot in his neighborhood around 5:00 a.m. 291 Ill.Dec. 786, 824 N.E.2d at 644. Although the officers had no reason to suspect the defendant of anything, they approached him and began questioning him. Id. They asked the defendant for identification, which he produced, and one of the officers then ran a computer check, which revealed a traffic warrant for the defendant. Id. The ensuing search of the defendant's person revealed drugs. Id. at 645.
{25} The appellate court affirmed the trial court's suppression of the drugs by first concluding that the questioning of the defendant and the taking of the defendant's identification in order to run a warrant check constituted a seizure that violated the Fourth Amendment. Id. at 645-48. The court then determined that the discovery of the outstanding warrant did not dissipate the taint of the illegal detention. In making this determination the court employed the analysis set out in Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), in which the United States Supreme Court listed three factors for assessing attenuation between illegal police conduct and the discovery of evidence. Mitchell, 291 Ill.Dec. 786, 824 N.E.2d at 649-50. The three factors are: "(1) the amount of time that elapsed between the illegality and the acquisition of evidence; (2) any intervening circumstances; and (3) *1245 the purpose and the flagrancy of the police misconduct." Id. at 649. The Mitchell court noted that appropriate analysis of these factors bolsters the purpose of the exclusionary rule, which is to deter unlawful police conduct. "Where the acquisition of evidence is sufficiently removed from the unlawful police conduct, the deterrent value of excluding it is diminished." Id.
{26} In applying the Brown factors, the Mitchell court concluded that the relatively short time between the defendant's detention and the search weighed in favor of suppression, but that the defendant's arrest constituted "an intervening circumstance that militates toward attenuation." 291 Ill.Dec. 786, 824 N.E.2d at 649. The court determined that it was the purpose and flagrancy of the police misconduct that tipped the balance in favor of suppression because "the officers stopped [the] defendant for no apparent reason other than to run a warrant check on him. Thus, the purpose of the stop . . . was directly related to the arrest of [the] defendant." Id.
{27} The circumstances in the present case are strikingly similar to those in Mitchell. In this case, as in Mitchell, police stopped Defendant on the basis of nothing other than the vague notion that they would obtain Defendant's personal information from him, and without any further suspicion, they ran a warrant check on him. The purpose of the stopto obtain information from Defendantwas directly related to Defendant's ultimate arrest. "While the harm to citizens from such conduct may not be terribly high, the complete disregard of citizens' rights to be secure in their person is clear." Id. (internal quotation marks omitted). Excluding the evidence obtained under such circumstances is "the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks." Id. at 650.
CONCLUSION
{28} For the foregoing reasons, we affirm the district court's order suppressing the evidence obtained as the result of Defendant's detention.
{29} IT IS SO ORDERED.
WE CONCUR: JONATHAN B. SUTIN, Chief Judge and RODERICK T. KENNEDY, Judge.